UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOROTHY DeANGELIS, Individually and on Behalf of All Others Similarly Situated, | ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) No. |
| vs. | ) |
| | ) CLASS ACTION |
| HURON CONSULTING GROUP INC., GARY E. HOLDREN, GARY L. BURGE, WAYNE LIPSKI and PRICEWATERHOUSECOOPERS LLP, | ) ) ) ) |
| | ) DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Huron Consulting Group Inc. ("Huron" or the "Company"), between April 27, 2006 and July 31, 2009, inclusive (the "Class Period"), against Huron and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Huron is a provider of financial and legal consulting services. The Company operates through four business segments: Health and Education Consulting, Accounting and Financial Consulting, Legal Consulting and Corporate Consulting. Huron was founded in 2002 by former partners of Arthur Andersen LLP, the accounting firm that collapsed in connection with its participation in the Enron Corporation accounting scandal. Huron grew substantially as a result of its acquisitions, acquiring seven companies from 2005 to 2008.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's financial results and compliance with Generally Accepted Accounting Principles ("GAAP").   Specifically, the Company misaccounted for payments made as part of acquisitions.   As a result of defendants' false and misleading statements, Huron stock traded at artificially inflated prices during the Class Period, reaching a high of $83.25 per share on December 26, 2007.   This inflated stock price permitted Huron to raise $185 million in a secondary stock offering in February 2006 and to acquire seven businesses from 2005 to 2008.

4.      Then on July 31, 2009, Huron announced that it would be restating its financial results from 2006 through 2008 and the first three months of 2009 due to its failure to properly account for earn-out payments made in connection with four of its acquisitions.   As a result of the restatement, Huron expected to dramatically reduce its revenue reported for the period by 48% from $120 million on an aggregate basis to $63 million.   The Company further announced that the Securities and Exchange Commission ("SEC") had commenced an inquiry into the Company's allocation of chargeable hours related to its recognition of revenue.   The SEC's inquiry was unrelated to the acquisition accounting issue.   Huron further withdrew its 2009 earnings guidance, lowered its 2009 revenue guidance and provided preliminary second-quarter revenue below analysts' expectations.   Finally, Huron announced that its chairman and Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO") had all resigned.

5.      On this news, Huron's stock collapsed $30.66 per share to close at $13.69 per share on August 3, 2009, a 1-day decline of more than 69%, on volume of more than 32 million shares or over 114 times the average 3-month daily volume.

## JURISDICTION AND VENUE

6.       Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

7.       Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

8.       Huron's principal executive offices are located at 550 West Van Buren Street, Chicago, Illinois.

## PARTIES

9.       Plaintiff Dorothy DeAngelis purchased Huron common stock as described in the attached certification and was damaged thereby.

10.       Defendant Huron is a provider of operational and financial consulting services.  The Company helps clients in diverse industries to resolve disputes, comply with complex regulations, recover from distress, leverage technology and stimulate growth.  The Company operates through four business segments: Health and Education Consulting, Accounting and Financial Consulting, Legal Consulting and Corporate Consulting.  The Health and Education Consulting segment provides consulting services to hospitals, health systems, physicians, managed care organizations, academic medical centers, colleges, universities, and pharmaceutical and medical device manufacturers.  The Accounting and Financial Consulting segment assists corporations with accounting and financial reporting matters, financial analysis in business disputes, international arbitration and litigation, as well as valuation analysis related to business acquisitions.  The Legal Consulting segment provides guidance and business services to address the challenges that confront legal organizations.  The Corporate Consulting segment helps clients through various stages of

transformation that result in measurable and sustainable performance improvement.  Huron was founded in 2002 and is headquartered in Chicago, Illinois.

11.     Defendant Gary E. Holdren ("Holdren") was, at all relevant times, President and CEO and a director of Huron.  Holdren was appointed Chairman of the Board in May 2009.  On July 27, 2009, defendant Holdren resigned from the Company.  During the Class Period, Holdren reaped over $16 million in insider trading proceeds by selling 275,500 shares of his Huron stock at artificially inflated prices.

12.     Defendant Gary L. Burge ("Burge") was, at all relevant times, CFO, Vice President and Treasurer of Huron until his resignation on July 31, 2009.  Burge will remain as Treasurer of the Company until December 31, 2009.  During the Class Period, Burge reaped over $444,381 in insider trading proceeds by selling 9,443 shares of his Huron stock at artificially inflated prices.

13.     Defendant Wayne Lipski ("Lipski") was, at all relevant times, CAO of Huron until his resignation on July 31, 2009.

14.     Defendants Holdren, Burge and Lipski (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Huron's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that

the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

15.    Defendant PricewaterhouseCoopers LLP ("PwC") offers auditing and accounting services and provides actuarial insurance, corporate reporting, financial accounting, sustainability reporting, internal audit, and regulatory compliance and reporting services.   PwC acted as the Company's independent outside auditor during the relevant period.  PwC audited the Company's false and misleading financial statements contained in the Forms 10-K for 2005-2008.  PwC issued materially false and misleading opinions in these statements.  PwC also issued quarterly reports on Huron's interim results, again without qualifications.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

16.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Huron.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Huron common stock was a success, as it: (i) deceived the investing public regarding Huron's prospects and business; (ii) artificially inflated the price of Huron's common stock; (iii) allowed defendants Holdren and Burge to sell over $16.4 million worth of their own Huron stock at artificially inflated prices; and (iv) caused plaintiff and other members of the Class to purchase Huron common stock at inflated prices.

## BACKGROUND

17.    Huron, founded in 2002, provides consulting services in the United States.  Its Health and Education Consulting segment provides federal healthcare contract consulting, medical cost containment, operational and financial advisory, and regulatory and contract compliance services to hospitals, health systems, physicians, managed care organizations, academic medical centers, colleges, universities, and pharmaceutical and medical device manufacturers.  The Company's Accounting and Financial Consulting segment provides financial and economic analyses to support

law firms and corporations in connection with business disputes, litigation, international arbitration, tax controversies, and regulatory or internal investigations; economic and statistical analyses in connection with litigation, regulatory hearings, bankruptcy and public policy issues; accounting and finance advisory; and optimal solutions in the areas of enterprise risk management, internal audit, and compliance with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").  It also delivers valuation analyses to clients and their advisors, including valuations of businesses, financial interests, intellectual property, real property, machinery and equipment, and other tangible and intangible assets; and provides tax planning and compliance services.  Its Legal Consulting segment offers digital evidence and discovery, document review, law firm management, records management, and strategic and operational improvement services.  The Company's Corporate Consulting segment provides consulting assistance to financially distressed companies, creditor constituencies, and other stakeholders in connection with out-of-court restructurings and bankruptcy proceedings.  Huron serves education, healthcare, pharmaceutical, professional, transportation, telecommunications, financial, electronics, consumer products, energy and utilities, industrial manufacturing, and food and beverage sectors.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Huron common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Huron has more than 21 million shares of stock outstanding, owned by hundreds if not thousands of persons.

20.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of Huron common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

21.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

22.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

23.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRE-CLASS PERIOD STATEMENTS

24.     On February 8, 2006, Huron completed a secondary public offering of common stock sold by HCG Holdings LLC totaling 6.3 million shares of common stock at $27 per share, with the underwriters exercising their option to purchase an additional 945,000 shares on March 3, 2006.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

25.    On April 27, 2006, Huron reported is first quarter 2006 financial results, in a release

which stated in part:

> Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the first quarter ended March 31, 2006.

> **First Quarter 2006 Results**

> Revenues of $62.2 million for the first quarter of 2006 increased 33.0% from $46.8 million for the first quarter of 2005. The Company's first quarter 2006 operating income was $9.7 million compared to $8.2 million in the first quarter of 2005. Net income was $5.6 million, or $0.33 per diluted share, for the first quarter of 2006 compared to $4.8 million, or $0.29 per diluted share, for the comparable quarter last year.

> "Huron Consulting Group performed well in the first quarter, driven by strong demand in our Disputes & Investigations practice with its continued work on high profile financial investigations. Our Higher Education and Legal Business Consulting practices also showed impressive growth in the marketplace. The other practices in Huron's balanced portfolio continued to meet our expectations," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group. "Demand for Huron's services in the marketplace continues to look robust and we are optimistic about the remainder of the year."

> First quarter 2006 earnings before interest, taxes, depreciation and amortization ("EBITDA") were $11.3 million, or 18.1% of revenues, compared to $9.1 million, or 19.4% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes costs associated with a secondary offering of the Company's common stock and share-based compensation expense, totaled $14.1 million in the first quarter of 2006, or 22.7% of revenues, compared to $10.5 million, or 22.4% of revenues, in the comparable quarter last year.

> *        *        *

> **Secondary Offering**

> On February 8, 2006, Huron completed its secondary offering of 6,300,000 shares of common stock by HCG Holdings LLC at the public offering price of $27.00 per share.  The underwriters of the Company's secondary offering also exercised in full the over-allotment option to purchase an additional 945,000 shares of common stock from the selling stockholder in the offering.  This reduces HCG Holdings LLC's ownership of the Company to 8.5%.

**Acquisition of the Assets of Galt & Company**

On April 3, 2006, Huron acquired the assets of Galt & Company.  Galt is a specialized advisory firm that designs and implements corporate-wide programs to improve shareholder returns.  The partners of Galt & Company have been associated with some of the more notable corporate revitalizations in recent years, including those at Gillette and Alcan.

Under the terms of the purchase agreement, Huron has acquired Galt & Company for approximately $20 million.  Additional consideration is payable if specific performance targets are met over a four-year period.  Galt & Company had unaudited 2005 calendar year revenues of approximately $17 million.  For reporting purposes, Galt & Company's business will be included in Huron's Operational Consulting segment.

26.    On August 8, 2006, Huron reported its second quarter 2006 financial results, in a release which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the second quarter ended June 30, 2006.

**Second Quarter 2006 Results**

Revenues of $67.8 million for the second quarter of 2006 increased 34.2% from $50.5 million for the second quarter of 2005.  The Company's second quarter 2006 operating income increased 38.7% to $11.3 million compared to $8.2 million in the second quarter of 2005.  Net income was $6.3 million, or $0.36 per diluted share, for the second quarter of 2006 compared to $4.7 million, or $0.28 per diluted share, for the comparable quarter last year.

"Huron Consulting Group generated very solid results during the second quarter, reflecting our balanced portfolio of service offerings," said Gary E. Holden, chairman and chief executive officer, Huron Consulting Group.  "In addition, we took steps to build for the future by adding a number of talented professionals and completing the acquisition of Galt & Company.  Since the end of the quarter, Huron has also completed three acquisitions that bolster our solutions to the legal channel."

Second quarter 2006 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 50.5% to $14.5 million, or 21.4% of revenues, compared to $9.6 million, or 19.1% of revenues, in the comparable quarter last year.  Adjusted EBITDA, which excludes costs associated with share-based compensation expense, increased 49.7% to $17.0 million in the second quarter of 2006, or 25.0% of revenues, compared to $11.3 million, or 22.4% of revenues, in the comparable quarter last year.

\*        \*        \*

**Year-to-Date Results**

Revenues of $130.0 million for the six months ended June 30, 2006 increased 33.6% from $97.3 million for the same period last year. The Company's operating income increased 28.1% to $21.0 million for the first half of 2006 compared to $16.4 million for the same period last year. Net income was $11.9 million, or $0.69 per diluted share, for the six months ended June 30, 2006 compared to $9.5 million, or $0.57 per diluted share, for the comparable period last year.

Year-to-date 2006 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 37.7% to $25.8 million, or 19.8% of revenues, compared to $18.7 million, or 19.2% of revenues, in the comparable period last year. Adjusted EBITDA, which excludes costs associated with a secondary offering of the Company's common stock and share-based compensation expense, increased 42.3% to $31.1 million for the first six months of 2006, or 23.9% of revenues, compared to $21.8 million, or 22.4% of revenues, in the same period last year.

*     *     *

**Acquisition of the Assets of Galt & Company**

On April 3, 2006, Huron acquired the assets of Galt & Company. Galt is a specialized advisory firm that designs and implements corporate-wide programs to improve shareholder returns. For reporting purposes, Galt & Company's business is included in Huron's Operational Consulting segment as of the acquisition date.

**Acquisitions of Aaxis Technologies and Document Review Consulting Services LLC**

On July 31, 2006, Huron acquired Aaxis Technologies and Document Review Consulting Services LLC to enhance the Company's service offerings to the office of the general counsel and law firms to help manage the proliferation of printed and electronic documents.

Under the terms of the purchase agreements, Huron has acquired the companies, including approximately $6 million of accounts receivable, for an aggregate purchase price of $24 million. On a combined basis, Aaxis Technologies and Document Review Consulting Services LLC had unaudited trailing 12 month revenues of approximately $18 million.

27.     On November 2, 2006, Huron reported its third quarter 2006 financial results, in a

release which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the third quarter ended September 30, 2006.

- 10 -

**Third Quarter 2006 Results**

Revenues of $75.2 million for the third quarter of 2006 increased 38.5% from $54.3 million for the third quarter of 2005. The Company's third quarter 2006 operating income increased 68.0% to $12.1 million compared to $7.2 million in the third quarter of 2005. Net income was $6.8 million, or $0.39 per diluted share, for the third quarter of 2006 compared to $3.8 million, or $0.22 per diluted share, for the comparable quarter last year. As previously disclosed, net income in the third quarter of 2005 was reduced by the write-off of an intangible asset and secondary offering costs resulting in a reduction in net income of $0.7 million, or $0.04 per diluted share.

"We continue to see strong demand in the marketplace for our services. Our third quarter financial results were driven by significant growth in our Disputes and Investigations, Galt & Company, Higher Education, and Legal Business Consulting practices. There was also solid demand for services from our Healthcare and other practices," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group. "We are encouraged by our outlook for the remainder of the year and well-positioned as we enter 2007."

Third quarter 2006 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 58.2% to $15.5 million, or 20.6% of revenues, compared to $9.8 million, or 18.1% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes costs associated with a secondary offering of the Company's common stock and share-based compensation expense, increased 49.2% to $18.0 million in the third quarter of 2006, or 24.0% of revenues, compared to $12.1 million, or 22.2% of revenues, in the comparable quarter last year.

*       *       *

**Year-to-Date Results**

Revenues of $205.2 million for the nine months ended September 30, 2006 increased 35.3% from $151.6 million for the same period last year. The Company's operating income increased 40.3% to $33.1 million for the nine months ended September 30, 2006 compared to $23.6 million for the same period last year. Net income was $18.7 million, or $1.08 per diluted share, for the nine months ended September 30, 2006 compared to $13.3 million, or $0.79 per diluted share, for the comparable period last year. As previously disclosed, net income in the third quarter of 2005 was reduced by certain charges resulting in a reduction in net income of $0.7 million, or $0.04 per diluted share.

Year-to-date 2006 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 44.7% to $41.3 million, or 20.1% of revenues, compared to $28.5 million, or 18.8% of revenues, in the comparable period last year. Adjusted EBITDA, which excludes costs associated with a secondary offering of the Company's common stock and share-based compensation expense, increased 44.8%

- 11 -

to $49.1 million for the first nine months of 2006, or 23.9% of revenues, compared to $33.9 million, or 22.4% of revenues, in the same period last year.

*    *    *

**Acquisitions of Aaxis Technologies Inc. and Document Review Consulting Services LLC**

On July 31, 2006, Huron acquired Aaxis Technologies Inc. and Document Review Consulting Services LLC in two separate transactions. These acquisitions enhance the Company's service offerings to the office of the general counsel and law firms to help manage the proliferation of printed and electronic documents.

28.     On February 22, 2007, Huron reported its fourth quarter and full year 2006 financial

results, in a release which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the fourth quarter and full year ended December 31, 2006.

"We are pleased by Huron's strong growth this year and we continue to see increased demand across our service offerings. Our disputes and investigations work remained a driving force in our solid results during each quarter of 2006. Once again, we were able to attract and retain top talent focused on superior client service. We were particularly excited about the early success in cross-selling new product offerings from our acquisitions in the legal channel, which proved to be of interest to our general counsel and law firm clients during the fourth quarter of 2006," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group.

"We remain very optimistic and excited about the marketplace demand entering the new year. We are looking forward to the contribution of the talented professionals who recently joined us through the January acquisitions of Wellspring Partners LTD and Glass & Associates, Inc. They are a good fit for our business. Huron is well-positioned for 2007 and longer-term growth," added Holdren.

**Fourth Quarter 2006 Results**

Revenues of $83.4 million for the fourth quarter of 2006 increased 50.0% from $55.6 million for the fourth quarter of 2005. The Company's fourth quarter 2006 operating income increased 80.4% to $14.4 million compared to $8.0 million in the fourth quarter of 2005. Net income was $8.0 million, or $0.46 per diluted share, for the fourth quarter of 2006 compared to $4.5 million, or $0.27 per diluted share, for the comparable quarter last year.

Fourth quarter 2006 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 82.7% to $17.6 million, or 21.1% of revenues, compared to $9.7 million, or 17.4% of revenues, in the comparable quarter last year.

Adjusted EBITDA, which excludes costs associated with a secondary offering of the Company's common stock and share-based compensation expense, increased 73.2% to $20.2 million in the fourth quarter of 2006, or 24.3% of revenues, compared to $11.7 million, or 21.0% of revenues, in the comparable quarter last year.

*       *       *

**Full Year 2006 Results**

Revenues of $288.6 million for the full year ended December 31, 2006 increased 39.3% from $207.2 for the full year ended December 31, 2005. The Company's operating income increased 50.4% to $47.5 million for the full year ended December 31, 2006 compared to $31.6 million for the same period last year. Net income was $26.7 million, or $1.54 per diluted share, for the full year ended December 31, 2006 compared to $17.8 million, or $1.05 per diluted share, for the comparable period last year.

Year-to-date 2006 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 54.3% to $58.9 million, or 20.4% of revenues, compared to $38.2 million, or 18.4% of revenues, in the comparable period last year. Adjusted EBITDA, which excludes costs associated with a secondary offering of the Company's common stock and share-based compensation expense, increased 52.0% to $69.3 million for the full year 2006, or 24.0% of revenues, compared to $45.6 million, or 22.0% of revenues, in the same period last year.

*       *       *

**Acquisitions of Wellspring Partners LTD and Glass & Associates, Inc**.

In January 2007, Huron acquired Wellspring Partners LTD, a leading management consulting firm specializing in integrated performance improvement services for hospitals and health systems, and Glass & Associates, Inc., a leading turnaround and restructuring firm.

29.    On May 3, 2007, Huron reported its first quarter 2007 financial results, in a release

which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the first quarter ended March 31, 2007.

"We are very pleased by Huron's strong growth in the quarter, and we continue to see increased demand across our service offerings," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group. "We continue to be able to attract and retain top talent focused on superior client service. Huron is now approaching 1,000 revenue-generating professionals – a significant milestone for a company that will mark its 5-year anniversary this month."

"We remain very optimistic and excited about the marketplace demand during the rest of 2007.  Huron is well-positioned for 2007 and longer-term growth," added Holdren.

**First Quarter 2007 Results**

Revenues of $116.0 million for the first quarter of 2007 increased 86.5% from $62.2 million for the first quarter of 2006.  The Company's first quarter 2007 operating income increased 95.5% to $18.9 million compared to $9.7 million in the first quarter of 2006.  Net income was $9.8 million, or $0.55 per diluted share, for the first quarter of 2007 compared to $5.6 million, or $0.33 per diluted share, for the comparable quarter last year.  Financial results for the first quarter of 2007 included $2.2 million of rapid amortization of intangible assets.

First quarter 2007 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 123.8% to $25.2 million, or 21.7% of revenues, compared to $11.3 million, or 18.1% of revenues, in the comparable quarter last year.  Adjusted EBITDA, which excludes share-based compensation expense and costs associated with a secondary offering of the Company's common stock in the first quarter of 2006, increased 108.7% to $29.4 million in the first quarter of 2007, or 25.3% of revenues, compared to $14.1 million, or 22.7% of revenues, in the comparable quarter last year.

\*     \*     \*

**Acquisitions of Wellspring Partners LTD and Glass & Associates, Inc.**

In January 2007, Huron acquired Wellspring Partners LTD, a leading management consulting firm specializing in integrated performance improvement services for hospitals and health systems, and Glass & Associates, Inc., a leading turnaround and restructuring firm.

30.     On August 7, 2007, Huron reported its second quarter 2007 financial results, in a

release which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the second quarter and six months ended June 30, 2007.

"We are very pleased with the strong revenue and earnings growth posted by Huron in the quarter, as we continue to execute our broad service portfolio strategy," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group.

"We are also very excited about our recent acquisitions of Callaway Partners and Aegis Advisers.  Callaway brings an immediate scope of practice expansion to Huron.  We see many opportunities to bring Callaway's senior project management

- 14 -

skills along with its variable, on-demand workforce to the marketplace to assist Huron clients with their various financial accounting and reporting challenges. We also look forward to introducing Huron's services to Callaway's client base. Our recent acquisition of Aegis further bolsters and builds out our capabilities to serve the community hospital market," added Holdren.

**Second Quarter 2007 Results**

Revenues of $118.3 million for the second quarter of 2007 increased 74.5% from $67.8 million for the second quarter of 2006. The Company's second quarter 2007 operating income increased 74.8% to $19.8 million compared to $11.3 million in the second quarter of 2006. Net income was $10.1 million, or $0.56 per diluted share, for the second quarter of 2007 compared to $6.3 million, or $0.36 per diluted share, for the comparable quarter last year. Financial results for the second quarter of 2007 and 2006 included $2.3 million and $1.6 million, respectively, of rapid amortization on intangible assets.

Second quarter 2007 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 80.8% to $26.2 million, or 22.2% of revenues, compared to $14.5 million, or 21.4% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes share-based compensation expense, increased 83.2% to $31.1 million in the second quarter of 2007, or 26.3% of revenues, compared to $17.0 million, or 25.0% of revenues, in the comparable quarter last year.

*     *     *

**Year-to-Date Results**

Revenues of $234.3 million for the first six months of 2007 increased 80.3% from $130.0 million for the first six months of 2006. The Company's six-month 2007 operating income increased 84.4% to $38.7 million compared to $21.0 million in the first half of 2006. Net income was $19.9 million, or $1.11 per diluted share, for the first six months of 2007 compared to $11.9 million, or $0.69 per diluted share, for the comparable period last year. Financial results for the first half of 2007 and 2006 included $4.5 million and $1.7 million, respectively, of rapid amortization of intangible assets.

First-half 2007 EBITDA increased 99.6% to $51.4 million, or 22.0% of revenues, compared to $25.8 million, or 19.8% of revenues, in the same period last year. Adjusted EBITDA, which excludes share-based compensation expense and costs associated with a secondary offering of the Company's common stock in the first quarter of 2006, increased 94.8% to $60.5 million in the first half of 2007, or 25.8% of revenues, compared to $31.1 million, or 23.9% of revenues, in the comparable period last year.

*     *     *

**Acquisitions**

In January 2007, Huron acquired Wellspring Partners LTD, a leading management consulting firm specializing in integrated performance improvement services for hospitals and health systems, and Glass & Associates, Inc., a leading turnaround and restructuring firm.

In July 2007, Huron announced the acquisition of Callaway Partners, LLC, an accounting and finance professional services firm based in Atlanta, GA. Callaway specializes in project management and staff augmentation for clients, focusing on general accounting/finance support, accounting and SEC reporting advisory services, internal audit, Sarbanes-Oxley compliance and corporate tax.

Also in July 2007, Huron announced the acquisition of Aegis Advisers, Ltd., a consulting firm that is well-known in the healthcare industry for its strategic planning skills, facility planning expertise, and ability to define community demographics to develop and implement strategies that capture market share.

31.    On October 31, 2007, Huron reported its third quarter 2007 financial results, in a release which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the third quarter and nine months ended September 30, 2007.

"Huron continued its strong growth in the quarter, and we again proved the value of our balanced portfolio of service offerings. The strength of our Healthcare and Education Consulting and Legal Consulting businesses were excellent this quarter. We are also optimistic about the continued growth prospects for our Financial Consulting business with the acquisition of Callaway Partners this quarter and we think our Corporate Consulting business has great potential," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group.

"We are seeing opportunities across all our businesses in what is a very large consulting marketplace. By being able to attract and retain the right people focused on delivering superior client service, Huron is well positioned for long-term growth," added Holdren.

**Third Quarter 2007 Results**

Revenues of $134.1 million for the third quarter of 2007 increased 78.3% from $75.2 million for the third quarter of 2006. The Company's third quarter 2007 operating income increased 80.0% to $21.8 million compared to $12.1 million in the third quarter of 2006. Net income was $10.5 million, or $0.58 per diluted share, for the third quarter of 2007 compared to $6.8 million, or $0.39 per diluted share, for the same quarter last year. Financial results for the third quarter of 2007 and 2006

- 16 -

included $2.2 million and $0.4 million, respectively, of rapid amortization on intangible assets.

Third quarter 2007 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 82.6% to $28.3 million, or 21.1% of revenues, compared to $15.5 million, or 20.6% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes share-based compensation expense, increased 86.0% to $33.5 million in the third quarter of 2007, or 25.0% of revenues, compared to $18.0 million, or 24.0% of revenues, in the comparable quarter last year.

*     *     *

**Year-to-Date Results**

Revenues of $368.3 million for the nine months ended September 30, 2007 increased 79.5% from $205.2 million for the same period last year. The Company's operating income increased 82.8% to $60.5 million for the nine months ended September 30, 2007 compared to $33.1 million the same period last year. Net income was $30.4 million, or $1.69 per diluted share, for the nine months ended September 30, 2007 compared to $18.7 million, or $1.08 per diluted share, for the comparable period last year. Financial results for the first nine months of 2007 and 2006 included $6.7 million and $2.1 million, respectively, of rapid amortization of intangible assets.

Year-to-date 2007 EBITDA increased 93.2% to $79.8 million, or 21.7% of revenues, compared to $41.3 million, or 20.1% of revenues, in the same period last year. Adjusted EBITDA, which excludes share-based compensation expense and costs associated with a secondary offering of the Company's common stock in the first quarter of 2006, increased 91.5% to $94.0 million in the first nine months of 2007, or 25.5% of revenues, compared to $49.1 million, or 23.9% of revenues, in the comparable period last year.

*     *     *

**Acquisitions**

In January 2007, Huron acquired Wellspring Partners LTD, a leading management consulting firm specializing in integrated performance improvement services for hospitals and health systems, and Glass & Associates, Inc., a leading turnaround and restructuring firm.

In July 2007, Huron acquired Callaway Partners, LLC, an accounting and finance professional services firm. Callaway specializes in project management and staff augmentation for clients, focusing on general accounting/finance support, accounting and SEC reporting advisory services, internal audit, Sarbanes-Oxley compliance and corporate tax solutions.

32.    Throughout December 2007, Huron's stock continued to increase, reaching over $83.25 per share.

33.    On February 20, 2008, Huron reported its financial results for fourth quarter and full year 2007, in a release which stated in part:

> Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the fourth quarter and full year ended December 31, 2007.
>
> "We are pleased by Huron's strong growth in 2007 and we continued to see increased demand across our service offerings. We made significant progress in continuing to build a business model that will meet the evolving needs of the marketplace. Through strategic acquisitions and organic growth, Huron was able to attract and retain top talent focused on superior client service," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group.
>
> "We remain optimistic and excited about the demand for our services entering 2008. Our Health and Education Consulting and Legal Consulting segments were major contributors to our strong results in 2007. Our portfolio of healthcare offerings has done very well, and we expect great things in that area in 2008. Our innovative approach to the legal marketplace was significantly bolstered by the introduction of the V3locityTM e-discovery solution in early 2008. In Financial Consulting, we are providing full service solutions to the office of the CFO and their direct reports. Our complement of finance and accounting experts combined with our on-demand resources are being well received in the marketplace. Our Strategy practice is thriving, and we are prepared to meet the anticipated increase in restructuring activity this year. Huron can help clients steer through the current climate of challenge and uncertainty," said Holdren.
>
> **Fourth Quarter 2007 Results**
>
> Revenues of $136.0 million for the fourth quarter of 2007 increased 63.0% from $83.4 million for the fourth quarter of 2006. The Company's fourth quarter 2007 operating income increased 61.3% to $23.2 million compared to $14.4 million in the fourth quarter of 2006. Net income was $11.5 million, or $0.63 per diluted share, for the fourth quarter of 2007 compared to $8.0 million, or $0.46 per diluted share, for the same period last year. Financial results for the fourth quarter of 2007 included $1.2 million of rapid amortization on intangible assets. There was no rapid amortization during the fourth quarter of 2006.
>
> Fourth quarter 2007 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 65.5% to $29.2 million, or 21.5% of revenues, compared to $17.6 million, or 21.1% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes share-based compensation expense, rose 71.6%

to $34.8 million, or 25.6% of revenues, compared to $20.2 million, or 24.3% of revenues, in the comparable quarter last year.

\*       \*       \*

**Full Year 2007 Results**

Revenues of $504.3 million for the full year ended December 31, 2007 increased 74.7% from $288.6 million for the full year ended December 31, 2006. The Company's operating income increased 76.3% to $83.7 million for the full year ended December 31, 2007 compared to $47.5 million for the same period last year. Net income was $41.9 million, or $2.32 per diluted share, for the full year ended December 31, 2007 compared to $26.7 million, or $1.54 per diluted share, for the comparable period last year. Financial results for the full year 2007 and 2006 included $7.9 million and $2.1 million, respectively, of rapid amortization of intangible assets.

Full year 2007 EBITDA increased 84.9% to $108.9 million, or 21.6% of revenues, compared to $58.9 million, or 20.4% of revenues, in the comparable period last year. Adjusted EBITDA, which excludes share-based compensation expense and costs associated with a secondary offering of the Company's common stock in the first quarter of 2006, increased 85.7% to $128.8 million, or 25.5% of revenues, compared to $69.3 million, or 24.0% of revenues, in the same period last year.

\*       \*       \*

**Acquisitions**

In January 2007, Huron acquired Wellspring Partners LTD, a leading management consulting firm specializing in integrated performance improvement services for hospitals and health systems, and Glass & Associates, Inc., a leading turnaround and restructuring firm.

In July 2007, Huron acquired Callaway Partners, LLC, a professional services firm focused on providing CFO solutions. Callaway specializes in project management and staff augmentation for clients, including general accounting/finance support, accounting and SEC reporting advisory services, internal audit, Sarbanes-Oxley compliance and corporate tax solutions.

34.     On May 6, 2008, Huron reported its first quarter 2008 financial results, in a release

which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the first quarter ended March 31, 2008.

- 19 -

"We are confident that our balanced portfolio of offerings will continue to deliver results," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group. "Huron's business remains fundamentally strong and is positioned to generate growth in the future. We continue to execute our business plan by identifying market demands, meeting the evolving needs of the marketplace, and helping clients solve complex business challenges."

**First Quarter 2008 Results**

Revenues of $139.4 million for the first quarter of 2008 increased 20.2% from $116.0 million for the first quarter of 2007. The Company's first quarter 2008 operating income increased 9.1% to $20.6 million compared to $18.9 million in the first quarter of 2007. Net income was $10.2 million, or $0.56 per diluted share, for the first quarter of 2008 compared to $9.8 million, or $0.55 per diluted share, for the same period last year. Financial results for the first quarter of 2007 included $2.2 million of rapid amortization on intangible assets. There was no rapid amortization in the first quarter of 2008.

First quarter 2008 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 2.4% to $25.8 million, or 18.5% of revenues, compared to $25.2 million, or 21.7% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes share-based compensation expense, rose 9.5% to $32.2 million, or 23.1% of revenues, compared to $29.4 million, or 25.3% of revenues, in the comparable quarter last year.

35. On August 5, 2008, Huron reported its second quarter 2008 financial results, in a

release which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the second quarter ended June 30, 2008.

"Huron's Health and Education Consulting and Legal Consulting businesses had very strong quarters and we are optimistic about their position to generate future growth. The addition of the Stockamp team will create a real powerhouse by serving multiple segments of the healthcare industry, including major health systems, academic medical centers and community hospitals," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group. "We are making targeted adjustments in certain businesses to make sure that we have people with the rights skill sets in place to meet marketplace needs. At the same time, we are executing our business plan by identifying market demands, meeting the evolving needs of the marketplace, and helping clients solve complex business challenges. We are confident that our balanced portfolio of offerings will continue to deliver results."

**Second Quarter 2008 Results**

Revenues of $143.4 million for the second quarter of 2008 increased 21.3% from $118.3 million for the second quarter of 2007. The Company's second quarter 2008 operating income increased 2.3% to $20.2 million compared to $19.8 million in the second quarter of 2007. Net income was $9.8 million, or $0.54 per diluted share, for the second quarter of 2008 compared to $10.1 million, or $0.56 per diluted share, for the same period last year. Financial results for the second quarter of 2007 included $2.3 million of rapid amortization of intangible assets. There was no rapid amortization in the second quarter of 2008.

Second quarter 2008 earnings before interest, taxes, depreciation and amortization ("EBITDA") was $25.6 million, or 17.9% of revenues, compared to $26.2 million, or 22.2% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes share-based compensation expense, was $32.8 million, or 22.9% of revenues, compared to $31.1 million, or 26.3% of revenues, in the comparable quarter last year.

\*       \*       \*

**Year-to-Date Results**

Revenues of $282.8 million for the first six months of 2008 increased 20.7% from $234.3 million for the first half of 2007. The Company's first half 2008 operating income increased 5.6% to $40.9 million compared to $38.7 million in the first half of 2007. Net income was $20.0 million, or $1.10 per diluted share, for the first half of 2008 compared to $19.9 million, or $1.11 per diluted share, for the same period last year. Financial results for the first half of 2007 included $4.5 million of rapid amortization of intangible assets. There was no rapid amortization in the first half of 2008.

EBITDA for both the first half of 2008 and 2007 was $51.4 million, or 18.2% of revenues in 2008 and 22.0% of revenues in 2007. Adjusted EBITDA, which excludes share-based compensation expense, rose 7.4% to $65.0 million, or 23.0% of revenues, compared to $60.5 million, or 25.8% of revenues, in the comparable period last year.

\*       \*       \*

**Stockamp & Associates Acquisition**

On July 8, 2008, Huron announced the acquisition of the assets of Stockamp & Associates, Inc., a nationally recognized management consulting firm specializing in helping high-performing hospitals and health systems optimize their financial and operational performance.

The initial purchase price was made for approximately $219 million, consisting of $169 million in cash and $50 million in stock, subject to adjustment. Additional purchase consideration will be payable if specific performance targets are met.

In the 12 months ended March 31, 2008, Stockamp had cash basis revenues of approximately $94 million.

36.    On October 30, 2008, Huron reported its third quarter 2008 financial results, in a release which stated in part:

Huron Consulting Group Inc., a leading provider of financial and operational consulting services, today announced financial results for the third quarter ended September 30, 2008.

"Huron's Health and Education Consulting and Legal Consulting businesses continued to drive the Company's strong results. We expect our Health and Education business to continue to experience growth given the increased focus on operating performance at hospitals, health systems and universities due to the broader financial crisis. Huron also continues to hold a leading market position in the Legal Consulting space. Corporate legal teams and law firms are turning to Huron and our V3locity e-discovery solution to manage the ever growing demand for discovery services. We remain optimistic about Huron's position to generate future growth in these businesses," said Gary E. Holden, chairman and chief executive officer, Huron Consulting Group. "Huron's Financial Consulting and Corporate Consulting businesses have the resources and experience to help clients deal with the business and financial issues that will inevitably develop from today's environment: disputes, investigations, valuations, restructurings and turnarounds."

"Huron has always focused on solutions that provide measurable business improvements – and those solutions should be all the more essential in today's environment. To the extent that we can predict near and longer term trends in our markets right now, we believe there will continue to be numerous opportunities for all of Huron's businesses in the remainder of 2008 and into 2009," added Holden.

**Acquisition of Stockamp & Associates**

In July 2008, Huron announced the acquisition of the assets of Stockamp & Associates, Inc., a nationally recognized management consulting firm specializing in helping high-performing hospitals and health systems optimize their financial and operational performance. The financial results of Stockamp have been included within the Health and Education Consulting segment since July 8, 2008.

**Third Quarter 2008 Results**

Revenues of $168.7 million for the third quarter of 2008 increased 25.8% from $134.1 million for the third quarter of 2007. The Company's third quarter 2008 operating income increased 2.1% to $22.3 million compared to $21.8 million in the third quarter of 2007. Net income was $8.8 million, or $0.44 per diluted share, for the third quarter of 2008 compared to $10.5 million, or $0.58 per diluted share, for the same period last year. Financial results for the third quarter of 2008 and 2007

included $2.0 million and $2.2 million, respectively, of rapid amortization of intangible assets. Financial results for the third quarter of 2008 also included $2.3 million of restructuring charges. As previously forecast, results for the third quarter of 2008 were unfavorably impacted by the Stockamp acquisition due to the timing of revenue recognition under GAAP, resulting in lower reported revenues and operating income, which are included within the Health and Education Consulting segment.

Third quarter 2008 earnings before interest, taxes, depreciation and amortization ("EBITDA") was $31.6 million, or 18.7% of revenues, compared to $28.3 million, or 21.1% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes share-based compensation expense and restructuring charges, was $40.8 million, or 24.2% of revenues, compared to $33.5 million, or 25.0% of revenues, in the comparable quarter last year.

*     *     *

**Year-to-Date Results**

Revenues of $451.5 million for the first nine months of 2008 increased 22.6% from $368.3 for the same period last year. The Company's operating income increased 4.4% to $63.1 million for the nine months ended September 30, 2008 compared to $60.5 million the same period last year. Net income was $28.9 million, or $1.54 per diluted share, for the nine months ended September 30, 2008 compared to $30.4 million, or $1.69 per diluted share, for the comparable period last year. Financial results for the first nine months of 2008 and 2007 included $2.0 million and $6.7 million, respectively, of rapid amortization of intangible assets. Financial results for the first nine months of 2008 also included $2.3 million of restructuring charges.

Year-to-date 2008 EBITDA increased 4.1% to $83.0 million, or 18.4% of revenues, compared to $79.8 million, or 21.7% of revenues, in the same period last year. Adjusted EBITDA, which excludes share-based compensation expense and restructuring charges, rose 12.5% to $105.8 million, or 23.4% of revenues, compared to $94.0 million, or 25.5% of revenues, in the comparable period last year.

37.     On February 24, 2009, Huron reported its fourth quarter and full year 2008 financial results, in a release which stated in part:

Huron Consulting Group Inc., a leading provider of business consulting services, today announced financial results for the fourth quarter and full year ended December 31, 2008.

"The current business environment has created unprecedented challenges for companies in many industries," said Gary E. Holdren, chairman and chief executive officer, Huron Consulting Group. "We were very pleased with the continued strength shown by our Health and Education Consulting segment and the significant

demand for our services, particularly in the healthcare provider sector.  This year is again shaping up to be a very good year for this segment, which now comprises more than 50 percent of Huron's revenue."

"However, revenues in our event-driven Legal and Accounting & Financial Consulting segments fell short of our expectations for the quarter as certain projects were either postponed or did not reach the revenue levels that were anticipated for these assignments," continued Holdren.  "Despite this, we remain cautiously optimistic that there will be meaningful demand for both of these segments in 2009 as we see a good pipeline of opportunities ahead of us."

"Huron's variable labor cost model and pay-for-performance compensation system along with other cost management efforts helped mitigate our fourth quarter revenue shortfalls.  We believe our variable labor and pay-for-performance models give us the flexibility needed to manage through an uncertain market in 2009."

**Fourth Quarter 2008 Results**

Revenues of $164.0 million for the fourth quarter of 2008 increased 20.6% from $136.0 million for the fourth quarter of 2007.  The Company's fourth quarter 2008 operating income increased 22.7% to $28.5 million compared to $23.2 million in the fourth quarter of 2007.  Net income was $11.8 million, or $0.59 per diluted share, for the fourth quarter of 2008 compared to $11.5 million, or $0.63 per diluted share, for the same period last year.  Financial results for the fourth quarter of 2008 included $2.8 million of rapid amortization on intangible assets compared to $1.2 million during the fourth quarter of 2007.

Fourth quarter 2008 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 32.2% to $38.6 million, or 23.5% of revenues, compared to $29.2 million, or 21.5% of revenues, in the comparable quarter last year.  Adjusted EBITDA, which excludes share-based compensation expense, rose 29.4% to $45.0 million, or 27.4% of revenues, compared to $34.8 million, or 25.6% of revenues, in the comparable quarter last year.

\*       \*       \*

**Full Year 2008 Results**

Revenues of $615.5 million for the full year ended December 31, 2008 increased 22.0% from $504.3 million for the full year ended December 31, 2007.  The Company's operating income increased 9.4% to $91.6 million for the full year ended December 31, 2008 compared to $83.7 million for the same period last year.  Net income was $40.7 million, or $2.13 per diluted share, for the full year ended December 31, 2008 compared to $41.9 million, or $2.32 per diluted share, for the comparable period last year.  Financial results for the full year 2008 and 2007 included $4.8 million and $7.9 million, respectively, of rapid amortization of intangible assets.

Full year 2008 EBITDA increased 11.6% to $121.6 million, or 19.8% of revenues, compared to $108.9 million, or 21.6% of revenues, in the comparable period last year. Adjusted EBITDA, which excludes share-based compensation expense and restructuring charges, increased 17.1% to $150.7 million, or 24.5% of revenues, compared to $128.8 million, or 25.5% of revenues, in the same period last year.

*      *      *

**Outlook for 2009**

Huron has decided that, effective with the current quarter, it will only provide a full year outlook on revenues, EBITDA, operating income and diluted earnings per share.

Based on currently available information, the Company anticipates full year 2009 revenues before reimbursable expenses in a range of $730 million to $770 million, EBITDA in a range of $162 million to $173 million, operating income in a range of $132 million to $143 million, and between $3.10 and $3.40 in diluted earnings per share.

Share-based compensation expense of approximately $30.5 million is included in the full year 2009 estimates. Weighted average diluted share counts for 2009 are estimated to be 20.7 million.

38.    On April 30, 2009, Huron reported its first quarter 2009 financial results, in a release

which stated in part:

Huron Consulting Group Inc., a leading provider of business consulting services, today announced financial results for the first quarter ended March 31, 2009.

"As we anticipated last quarter, the first three months of 2009 have been positive for our Health and Education Consulting segment, which represented 57 percent of Huron's revenues in the quarter. This segment continued its substantial growth given the ongoing financial and operational pressures hospitals, healthcare organizations and universities are facing," said Gary E. Holden, chairman and chief executive officer, Huron Consulting Group.

"We remain confident of Huron's ability to generate meaningful incremental growth during 2009. Health and Education Consulting should continue to produce strong results and increasing second half revenues based upon a strong backlog and forecasted contingent fees. We are seeing solid, ongoing demand in Corporate Consulting. In both Legal Consulting and Accounting & Financial Consulting, recent new client wins and a solid pipeline of new opportunities cause us to be optimistic that these segments will demonstrate improvements during the balance of the year," added Holdren. "We reiterate our previous outlook for Huron's full year

performance.  We are increasingly confident of our ability to generate higher revenues throughout the remaining three quarters of the year, while meeting our bottom line expectations by maintaining strong management of headcount as well as SG&A expenses."

**First Quarter 2009 Results**

Revenues of $163.0 million for the first quarter of 2009 increased 16.9% from $139.4 million for the first quarter of 2008.  The Company's first quarter 2009 operating income increased 5.9% to $21.8 million compared to $20.6 million in the first quarter of 2008.  Net income was $10.3 million, or $0.51 per diluted share, for the first quarter of 2009 compared to $10.2 million, or $0.56 per diluted share, for the same period last year.  Severance charges for Q1 2009 were $1.4 million compared to $0.3 million in Q1 2008 with these charges representing approximately $0.04 per diluted share in Q1 2009 versus $0.01 per diluted share in Q1 2008.

*     *     *

**Outlook for 2009**

Huron reiterated its previous outlook for 2009 based upon current market conditions, including solid backlog growth and recent increases in the pipeline of new opportunities.  The Company anticipates full year 2009 revenues before reimbursable expenses in a range of $730 million to $770 million, EBITDA in a range of $162 million to $173 million, operating income in a range of $132 million to $143 million, and between $3.10 and $3.40 in diluted earnings per share.

Share-based compensation expense of approximately $30.5 million is included in the full year 2009 estimates.  Weighted average diluted share counts for 2009 are estimated to be 20.7 million.

39.     Then, on July 31, 2009, the Company issued a press release entitled "Huron Consulting Group Announces Intention to Restate Financial Statements and Management Changes; The Company Provides Preliminary Second Quarter and Estimated Full Year 2009 Revenues," which stated in part:

- Company to restate financial statements for the fiscal years 2006, 2007 and 2008 and Q1 2009.

- Restatement pertains to non-cash charges relating to how payments received by the sellers of certain acquired businesses were subsequently redistributed among themselves and to other select Huron employees.

- Total estimated impact on net income and EBITDA for all restated periods of $57 million.

- Restatement has no impact on cash, cash flows from operations or adjusted EBITDA.

- George Massaro and James H. Roth appointed Non-Executive Chairman of the Board of Directors and Chief Executive Officer, respectively.

- Preliminary Q2 2009 revenues before reimbursable expenses in a range of $164 million to $166 million.

- Estimated full year 2009 revenues before reimbursable expenses in a range of $650 million to $680 million.

Huron Consulting Group Inc., a leading provider of business consulting services, today announced that *the Company will restate its financial statements for the fiscal years 2006, 2007 and 2008 and the first quarter of 2009, to correct the Company's accounting for certain acquisition-related payments received by the sellers in connection with the sale of certain acquired businesses that were subsequently redistributed among themselves and to other select Huron employees. As a result, the historical financial statements for these periods should no longer be relied upon*. The restatement items are non-cash charges with a total estimated impact on net income and EBITDA for all restated periods of $57 million. The restatement has no impact on cash, cash flows from operations, or adjusted EBITDA. The sellers have recently amended their agreements related to these payments. While there can be no assurances, as discussed below, the Company currently anticipates that the non-cash compensation charges causing the restatement will not continue past July 31, 2009. *In addition, the Company announced management changes, including the appointment of George Massaro as Non-Executive Chairman of the Board and James H. Roth, a founder of the Company, as Chief Executive Officer. Both appointments follow the resignation of Gary E. Holdren as Chairman of the Board and Chief Executive Officer*.

**Financial Statement Restatement**

The restatement relates to four businesses that the Company acquired between 2005 and 2007 (the "Acquired Businesses"). Pursuant to the purchase agreements for each of these acquisitions, payments were made by the Company to the selling shareholders upon closing of the transaction and also, in some cases, upon the Acquired Businesses achieving specific financial performance targets over a number of years ("earn-outs"). These payments are collectively referred to as "acquisition-related payments."

It recently came to the attention of the Audit Committee of the Board of Directors that, in connection with one of these acquisitions, the selling shareholders

had an agreement among themselves to reallocate a portion of the earn-out payments to an employee of the Company who was not a selling shareholder. Following this discovery, the Audit Committee commenced an inquiry into the relevant facts and circumstances of all of the Company's prior acquisitions to determine if similar situations existed. The Audit Committee engaged legal and financial advisors to assist it with the inquiry and notified the Company's independent auditors who had not previously been aware of the Shareholder and Employee Payments described below.

*This inquiry resulted in the discovery that the selling shareholders of the Acquired Businesses*:

1) *Redistributed portions of their acquisition-related payments among themselves in amounts that were not consistent with their ownership percentages ("Shareholder Payments") at the date of acquisition by Huron. Such payments were dependent, in part, on continuing employment with Huron or on the achievement of personal performance measures; or*

2) *Redistributed portions of their acquisition-related payments to certain Company employees ("Employee Payments") who were not selling shareholders of the Acquired Businesses. Such payments were dependent on continuing employment with Huron or on the achievement of personal performance measures*.

\*        \*        \*

"Huron is committed to the highest standards of business conduct, compliance, financial reporting and internal controls," said John McCartney, chairman of the Audit Committee of Huron Consulting Group's Board of Directors. "When we became aware of these matters, the Audit Committee immediately engaged legal and accounting experts, who have been working diligently with our internal staff and independent auditors to identify, quantify and correct these matters."

While the correction of these errors significantly reduced the Company's net income, earnings per share and EBITDA for each of the affected periods, it had no effect on the Company's total assets, total liabilities, total stockholders' equity, cash flows from operations, or adjusted EBITDA.

\*        \*        \*

Based on the results of the inquiry into acquisition-related matters to date and the agreement amendments described below, the Company currently anticipates that future earn-out payments will only be accounted for as additional purchase consideration and not also as non-cash compensation expense. Effective August 1, 2009, the selling shareholders of two of the Acquired Businesses each amended certain agreements related to the earn-out payments to provide that future earn-out payments will be distributed only to the applicable selling shareholders and only in accordance with their equity interests at the date of the acquisition by Huron and no

further Shareholder Payments or Employee Payments will be made.  As a result of these amendments, the Company expects to incur a moderate increase in cash compensation expense in future periods.  However, the inquiry is ongoing, and there can be no assurance that additional information will not be discovered that will require these payments to continue to be accounted for as non-cash compensation expense, which would be material to results of operations through 2011.  The earn-out payments for one of the Acquired Businesses are payable through March 31, 2010, and the earn-out payments for a second Acquired Business are payable through December 31, 2011.  There are no additional earn-out obligations related to the other two Acquired Businesses.

*In addition to the restatement and the inquiry into acquisition-related matters by the Company, the Company is conducting a separate inquiry, in response to an inquiry from the SEC, into the allocation of chargeable hours.  This matter has no impact on billings to the Company's clients, but could impact the timing of when revenue is recognized.*  Based on information to date, the Company does not expect the allocation inquiry to result in a material adjustment to its historical financial statements.

*       *       *

**2009 Outlook**

*The Company has withdrawn its previously disclosed full year 2009 guidance.  Based upon the assessment of existing backlog, the pipeline of new proposal opportunities, and continuing uncertain economic conditions, the Company has revised its 2009 outlook for revenues before reimbursable expenses to a range of $650 million to $680 million for the year.*

In response to these lowered revenue expectations, the Company has initiated a cost reduction program that is estimated to result in an annualized $30 million reduction in operating expenses.  These efforts are expected to allow the Company to maintain solid operating margins until economic conditions improve.  The Company currently estimates it will recognize approximately a $4 million to $6 million restructuring charge associated with the cost reduction efforts in Q3 2009.  The Company anticipates providing EBITDA, operating income and earnings per share guidance for the year (with and without non-cash charges, restructuring charges, and costs associated with the inquiries) upon completion of its restatement process.

"While we have chosen to adjust revenue guidance and manage our expense levels more closely in these uncertain times, our fundamental operating results remain strong as does the long-term outlook for each of our segments," said David M. Shade, president and chief operating officer, Huron Consulting Group.  "We remain confident that our service offerings will continue to be right on target when it comes to meeting the needs of our clients as market conditions improve."

40.    On this news, Huron's stock collapsed $30.66 per share to close at $13.69 per share on August 3, 2009, a 1-day decline of more than 69%, on volume of more than 32 million shares or over 114 times the average 3-month daily volume.

41.    Subsequently, on August 3, 2009, Huron issued a press release entitled "Huron Consulting Group Provides Restatement-Related Q&A," which stated in part:

> Huron Consulting Group Inc. announced on July 31, 2009 that the Company will restate its financial statements for the fiscal years 2006, 2007 and 2008 and the first quarter of 2009 to correct the Company's accounting for certain acquisition-related payments received by the sellers in connection with the sale of certain acquired businesses that were subsequently redistributed among themselves and to other select Huron employees.
>
> The restatement relates to four businesses that the Company acquired between 2005 and 2007 (the "Acquired Businesses"). Pursuant to the purchase agreements for each of these acquisitions, payments were made by the Company to the selling shareholders upon closing of the transaction and also, in some cases, upon the Acquired Businesses achieving specific financial performance targets over a number of years ("earn-outs"). These payments are collectively referred to as "acquisition-related payments."
>
> It recently came to the attention of the Audit Committee of the Board of Directors that, in connection with one of these acquisitions, the selling shareholders had an agreement among themselves to reallocate a portion of the earn-out payments to an employee of the Company who was not a selling shareholder. Following this discovery, the Audit Committee commenced an inquiry into the relevant facts and circumstances of all of the Company's prior acquisitions to determine if similar situations existed. The Audit Committee engaged legal and financial advisors to assist it with the inquiry and notified the Company's independent auditors who had not previously been aware of the Shareholder and Employee Payments described below.
>
> This inquiry resulted in the discovery that the selling shareholders of the Acquired Businesses:
>
> 1) Redistributed portions of their acquisition-related payments among themselves in amounts that were not consistent with their ownership percentages ("Shareholder Payments") at the date of acquisition by Huron. Such payments were dependent, in part, on continuing employment with Huron or on the achievement of personal performance measures; or
>
> 2) Redistributed portions of their acquisition-related payments to certain Company employees ("Employee Payments") who were not selling shareholders of

the Acquired Businesses. Such payments were dependent on continuing employment with Huron or on the achievement of personal performance measures.

Under generally accepted accounting principles ("GAAP"), including guidance promulgated by the U.S. Securities and Exchange Commission ("SEC"), actions of economic interest holders in a company may be imputed to the company itself. As the selling shareholders meet the criteria of economic interest holders in Huron, the Shareholder Payments and the Employee Payments are imputed to the Company even when the amounts that are reallocated do not differ significantly from ownership percentages at the date of the acquisition by Huron. As a result, both the Shareholder Payments and the Employee Payments are required to be reflected as non-cash compensation expense of the Company with a corresponding increase to additional paid-in capital. There is no tax impact to these adjustments.

While the correction of these errors significantly reduced the Company's net income, earnings per share and EBITDA for each of the affected periods, it had no effect on the Company's total assets, total liabilities, total stockholders' equity, cash flows from operations, or adjusted EBITDA.

**1)      How were the acquisition-related payments originally accounted for?**

The acquisition-related payments made by the Company to the selling shareholders represent purchase consideration. As such, these payments were correctly recorded as goodwill, in accordance with GAAP. Payments made upon the closing of the acquisition are recorded as goodwill on the date of closing. Earn-out payments are recorded as goodwill when the financial performance targets are met by the Acquired Businesses.

**2)      Why is a restatement required?**

The Shareholder Payments and the Employee Payments are in substance a second and separate transaction from the Company's acquisition of the Acquired Businesses, which resulted in a separate non-cash accounting entry that was not recorded by the Company.

Under GAAP, the selling shareholders are economic interest holders of Huron due to their ability to earn additional consideration from Huron. As such, when the selling shareholders pay a portion of their closing proceeds or earn-outs to Huron employees who were not selling shareholders or redistribute those proceeds among themselves based on employment or performance-based criteria, under GAAP, these payments are viewed as resulting from service that is assumed to have benefited the Company. Therefore, these payments are deemed to be non-cash compensation expense for the Company, and the selling shareholders are deemed to have made a capital contribution to the Company.

**3) Why would amounts ultimately received and retained by selling shareholders (Shareholder Payments) be included?**

The amount that is deemed to be non-cash compensation expense is the entire amount of the earn-out that was subject to redistribution based on their employment or performance as Huron employees. For example, if 60% of the earn-out was distributed based on ownership percentage and 40% of the earn-out was distributed by the selling shareholders based on employment or performance, then the entire 40% is deemed to be non-cash compensation expense, even if the amounts ultimately received by the selling shareholders do not differ significantly from their original ownership percentages.

**4) Who were the certain Company employees that received the "Employee Payments"?**

The Company employees who received the Employee Payments were client-serving and administrative employees of the respective acquired businesses at the date of the acquisition by Huron and similar employees hired by the respective acquired business after the date of such acquisitions. The Employee Payments were not "kickbacks" to Huron management.

**5) Why are the required accounting entries non-cash?**

The entries are non-cash because the payments were made directly by the selling shareholders from the acquisition proceeds they received from the Company. The Company did not expend additional cash with respect to the compensation charge.

**6) What is the required non-cash journal entry?**

An example of the restated entry is as follows:

Debit          Non-cash Compensation Expense      X

Credit         Additional Paid-in Capital      X

42. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The Company had failed to properly account for earn-out payments made in connection with its acquisitions in violation of GAAP;

(b)     The Company had failed to properly account for its revenue in violation of GAAP;

- 32 -

(c)    The Company had failed to maintain effective internal controls; and

(d)    Given the turmoil in the economy, the Company had no reasonable basis to make projections about its 2009 results.

43.    As a result of defendants' false statements, Huron's stock price traded at inflated levels during the Class Period. This drop removed inflation from Huron's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## HURON'S FALSE FINANCIAL REPORTING
## DURING THE CLASS PERIOD

44.    Prior to and during the Class Period, defendants caused the Company to falsely report its results for 2006 through 2008 and the first three months of 2009 through improperly accounting for its earn-out payments related to its acquisitions and through improperly accounting for its revenue, which understated the Company's reported net income. The Company has announced that it will restate its financial statements due to its improper acquisition accounting, materially reducing its reported net earnings. The Company has further announced that the SEC has commenced an inquiry into its allocation of chargeable hours related to its revenue recognition.

45.    The results from 2006 through first quarter 2009 were included in Forms 10-K and Forms 10-Q filed with the SEC. The results were also included in press releases disseminated to the public. The SEC filings represented that the financial information presented therein was a fair statement of Huron's financial results and that the results were prepared in accordance with GAAP.

46.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Huron's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

47.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

48.     Huron improperly accounted for certain payments made to selling shareholders in connection with its acquisitions.  From 2005 through 2008, Huron acquired seven companies.  In each of these acquisitions, Huron agreed to certain additional acquisition-related payments or earn-out payments.  Earn-out payments are additional payments made to selling shareholders in a merger or acquisition that is not part of the acquisition cost.  The payments are contingent upon the acquired company reaching certain future financial performance targets within a certain period of time following the closing of the transaction.  Huron's earn-out periods typically ran from three to four years following the completion of the acquisition.

49.     Companies account for their business combinations using the purchase method of accounting as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*.  Under the purchase method of accounting, the assets acquired and liabilities assumed are initially recorded at their respective fair market value as of the date of the acquisition.  The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill.  Contingent consideration may be recorded as goodwill provided the payments meet certain conditions, including the following: the payments are only made to selling shareholders;

the payments are made on a basis consistent with ownership percentages at the date of the acquisition; and the payments are not dependent on continuing employment or on the achievement of personal performance measures.  If one of the criteria is not meet, then the additional payments are considered to be compensation and are recorded as an expense in the period incurred.  SFAS No. 141, ¶¶3-8, 25-43.

50.     From 2006 through the first three months of 2009, Huron made certain additional acquisition-related payments in connection with four of its acquisitions.  Huron accounted for these acquisition-related payments as additions to goodwill instead of as compensation expense in violation of GAAP.  By recording the payments as goodwill, Huron was able to avoid taking a charge against its reported net earnings.

51.     Ultimately, on July 31, 2009, Huron announced that its previously announced historical financial statements should no longer be relied upon as it expected to restate its financial statements for the quarterly and annual periods from January 1, 2006 through March 31, 2009 due to improper accounting for earn-out payments made in connection with four of its acquisitions from 2005 through 2007.  As a result of the anticipated restatement, Huron expects to dramatically reduce its revenue reported for the period by 48% from $120 million on an aggregate basis to $63 million.

52.     The Company further announced on July 31, 2009 that the SEC had commenced an inquiry into the Company's allocation of chargeable hours related to its recognition of revenue.  The SEC's inquiry was unrelated to the acquisition-related payments issue.

**Huron's Restatement Is an Admission of Falsity**

53.     As a result of Huron's improper accounting practices with respect to its accounts receivable reserves, it has announced that it expects to restate its financial statements for the quarterly and annual periods from January 1, 2006 through March 31, 2009.  The fact that Huron will restate its financial statements is an admission that:

(a)    the financial results originally issued prior to and during the Class Period and its public statements regarding those results were materially false and misleading;

(b)    the financial statements reported prior to and during the Class Period were incorrect based on information available to defendants at the time the results were originally reported; and

(c)    the financial statements can no longer be relied upon as being accurate.

54.    The SEC has reiterated its position regarding restatements:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, ***inter alia, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter*** . . . .

*In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report at 1 (S.D. Fla. Feb. 22, 2002).

55.    The fact that Huron will restate its financial statements is an admission that the financial statements originally issued were false and that the overstatement of its income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Huron was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  Moreover, SFAS No. 154, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements."  SFAS No. 154, ¶25.  Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements.  Huron's restatements are due to errors with respect to accounting for earn-out payments made in

connection with its acquisitions.  Thus, the restatements are admissions by Huron that its previously issued financial results and its public statements regarding those results were false.

**Huron's Financial Statements Violated Fundamental Concepts of GAAP**

56.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use

information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

57.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### HURON'S VIOLATIONS OF SEC REGULATIONS DUE TO INADEQUATE INTERNAL CONTROLS

58.    Throughout the Class Period, defendants were able to cause the Company to issue materially false and misleading financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls over financial reporting relating to its

accounting for its revenue and its acquisitions.  Section 13(b)(2) of the 1934 Act states, in pertinent

part, that every reporting company must:

> (A)    make and keep books, records, and accounts, which, in reasonable
> detail, accurately and fairly reflect the transactions and dispositions of the assets of
> the issuer;
>
> (B)    devise and maintain a system of internal accounting controls sufficient
> to provide reasonable assurances that –
>
> *        *        *
>
> ii)    transactions are recorded as necessary . . . to permit preparation of
> financial statements in conformity with [GAAP].

15 U.S.C. §78m(b)(2)(A)-(B).

59.    These provisions require an issuer to employ and supervise reliable personnel, to

maintain reasonable assurances that transactions are executed as authorized, to properly record

transactions on an issuer's books and, at reasonable intervals, to compare accounting records with

physical assets.  *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

60.    Defendants caused Huron to violate §13(b)(2)(A) of the 1934 Act by failing to

maintain accurate records.  Huron's inaccurate and false records were not isolated or unique

instances because they were improperly maintained for multiple reporting periods.  Accordingly,

Huron violated §13(b)(2)(A) of the 1934 Act.

61.    In addition, defendants caused Huron to violate §13(b)(2)(B) of the 1934 Act by

failing to implement procedures reasonably designed to prevent accounting irregularities.  Huron

failed to ensure that proper review and checks were in place to ensure that it was recording and

properly reporting its revenue and payments made related to its acquisitions.  In fact, despite

knowing the true dismal state of the Company's lack of adequate controls, defendants regularly

issued quarterly financial statements throughout the Class Period without ever disclosing the

deficiencies in Huron's internal accounting controls and falsely asserting that its financial statements complied with GAAP.

62.    During the Class Period, defendants caused the Company to make representations that Huron's internal disclosure and accounting controls were designed to be effective and detect and prevent fraud and had been tested and found to be effective.

63.    These representations were false as Huron's disclosure controls and procedures were not effective and the Company's financial statements were not fairly presented in accordance with GAAP.  During the Class Period, Huron violated §13(b)(2)(A) of the 1934 Act by failing to maintain adequate internal controls in order to insure that its financial statements were prepared in conformity with GAAP and that its public filings were accurate.

64.    Ultimately, on July 31, 2009, the Company acknowledged that it was currently reviewing its internal controls over financial reporting and it expected to find material weaknesses in the Company's internal controls.

65.    Huron's lack of adequate internal controls rendered Huron's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.  Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without disclosing the existence of all of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

### PWC'S PARTICIPATION IN THE ISSUANCE OF FALSE FINANCIALS

66.    PwC, a firm of certified public accountants, was engaged by Huron to provide independent auditing and accounting services at all times relevant to this action.  PwC has been Huron's auditor since at least 2003, prior to its going public.  PwC was engaged to examine and report on Huron's financial statements for 2006-2008 and to perform review services on Huron's

interim results for 2006, 2007, 2008 and 2009.  PwC was extensively involved in Huron's accounting for its acquisitions and as a result a large portion of its fees were tied to other services it provided to Huron, including services involving due diligence related to merger and acquisitions, accounting consultations and audits in connection with acquisitions, and internal control reviews. For example in 2007, PwC earned 36% of its fees in conducting its audit of Huron's financial statements whereas PwC generated nearly 40% of its fees in providing Huron with services related to its acquisitions and internal controls.[1]  As a result of the far-reaching scope of services provided by PwC, PwC personnel were intimately familiar with Huron's business, including Huron's accounting for its acquisitions and its revenue recognition.

**PwC's False Statements as to Huron's 2006-2008 Financial Statements**

67.     PwC falsely represented that Huron's financial results for 2006 through 2008 were presented in accordance with GAAP and that PwC's audits and reviews of Huron's financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS").  PwC consented to the incorporation of its false reports on Huron's financial statements in Huron's Forms 10-K for 2006, 2007 and 2008, which were filed with the SEC.  PwC's issuance of false reports on Huron's 2006-2008 financial statements were themselves violations of GAAS.

68.     The SEC has stressed the importance of meaningful audits being performed by independent accountants:

> [T]he capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are

---

[1]     PwC earned the remaining 24% by providing tax services to Huron.

thus key to the formation and effective allocation of capital. ***Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised***.

*Relationships Between Registrants and Independent Accountants*, SEC Accounting Series Release No. 296, 1981 SEC LEXIS 858, at *8-*9 (Aug. 20, 1981).

69.    GAAS, as approved and adopted by the AICPA, relate to the conduct of individual audit engagements. Statements on Auditing Standards (codified and referred to as "AU §___") are recognized by the AICPA as the interpretation of GAAS.

70.    With respect to Huron's financial statements for 2006, PwC represented, in its Report of Independent Registered Public Accounting Firm dated February 22, 2007 and included in the Company's 2006 Form 10-K, the following:

> We have completed integrated audits of Huron Consulting Group Inc.'s 2006 and 2005 consolidated financial statements and of its internal control over financial reporting as of December 31, 2006, and an audit of its 2004 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

> *Consolidated financial statements*

> In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Huron Consulting Group Inc. and its subsidiaries at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for share-based compensation in 2006.

*Internal control over financial reporting*

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2006 based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control – Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become

inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

71.    PwC issued nearly identical unqualified audit reports with respect to Huron's financial statements for 2007 and 2008, in letters dated February 19, 2008 and February 24, 2009, respectively.  These audit reports were included in the Company's 2007 and 2008 Forms 10-K.

72.    PwC's reports and approval of the financial results were false and misleading due to its failure to comply with GAAS and because Huron's financial statements were not prepared in conformity with GAAP so that issuing the reports or approving Huron's financial results was in violation of GAAS and SEC rules.  PwC knew its reports and approval of the financial statements would be relied upon by the Company as well as by present and potential investors in Huron's securities.

**PwC Ignored the Audit Evidence It Gathered**

73.    GAAS, as set forth in AU §326, *Evidential Matter*, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved.  The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation.  In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles.  In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements.  To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).

74.     PwC's responsibility, as Huron's independent auditor, was to obtain "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles."  AU §§110.01, 150.02.

75.     In violation of GAAS, and contrary to the representations in its report on Huron's financial statements, PwC did not obtain sufficient, competent evidential matter to support Huron's assertions regarding its accounting for its acquisitions or its revenue recognition.

**PwC Failed to Design Its Audit to Identify the Alleged Improprieties**

76.     As one of the largest audit firms in the world, PwC was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit.  Also, PwC knew of the audit risks inherent at Huron and in the industries in which Huron operated because of the comprehensive services it provided to Huron and its experience with many other clients.  In connection with Huron's operations, PwC had virtually limitless access to information concerning the Company's true operations as:

- PwC had been Huron's auditor since at least 2003;

- PwC representatives were present at Huron's headquarters and divisions frequently;

- PwC had frequent conversations with Huron management and employees about the Company's operations and financial statements;

- PwC audited and reviewed Huron's financial statements at all relevant times and knew or should have known that Huron's financial statements were not accurate or prepared in compliance with GAAP or GAAS; and

- PwC provided Huron with due diligence services and accounting consultations and audits related to its acquisitions.

77.     PwC's intentional failure to comply with GAAS in PwC's performance on the Huron audits rose to the level of deliberate recklessness, as the following paragraphs demonstrate.  PwC

abandoned its role as independent auditor by turning a blind eye to each of the above indications of improper accounting, including Huron's accounting for its acquisitions and its revenue recognition. Despite this knowledge, PwC did not insist upon adjustments to Huron's audited financial statements. Pursuant to GAAS, PwC should have issued a qualified or adverse report, or it should have insisted that Huron comply with GAAP. Furthermore, PwC should have refused to approve Huron's quarterly financial results.

78.    As to its audits of Huron, PwC was required to perform its audit in conformity with the Statement of Accounting Standard ("SAS") No. 82, *Consideration of Fraud in a Financial Statement Audit*, which includes auditing for misstatements arising from the misappropriation of assets. PwC failed to comply with SAS No. 82 in its audit of Huron's financial statements. During the course of its audit of Huron's financial statements, PwC knew of or should have discovered the irregularities which caused Huron's financial results to be misstated for years. The very risk of fraud was a potential reportable condition which should have been reported to the audit committee and possibly senior management.

79.    PwC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of several years, leading to false and misstated financial statements and a significant restatement and an inquiry by the SEC.

80.    Furthermore, PwC recklessly disregarded numerous red flags that should have alerted PwC that Huron's financial statements were materially false and misleading. Many of the red flags PwC ignored mirrored the risk factors PwC was required to consider according to AU §316, *Consideration of Fraud in a Financial Statement Audit*, including:

- Unusually rapid growth or profitability, especially compared with that of other companies in the same industry;

- Specific indicators that include a motivation for management to engage in fraudulent financial reporting;

- An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices;

- A practice by management of committing to analysts, creditors, and other third parties to achieve what appears to be unduly aggressive or clearly unrealistic forecasts;

- Domination of management by a single person or small group without compensating controls such as effective oversight by the board of directors or audit committee;

- Management failing to display an appropriate attitude towards internal controls and the financial reporting process;

- Claims against the entity or its senior management alleging fraud or violations of securities laws;

- Management setting unduly aggressive financial targets and expectations for operating personnel; and

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm.

81.    Here, PwC did not miss just one item or two items, but numerous items. There was not just one form of manipulation, but several, which PwC was aware of, or which PwC would have been aware of had it not recklessly ignored numerous red flags.

**PwC Failed to Identify Material Weaknesses in Internal Controls**

82.    PwC, as Huron's auditor, was obligated to assess Huron's internal disclosure, financial and accounting controls, and whether such controls had been placed in operation, were effective and complied with Sarbanes-Oxley, including controls to provide assurance about the safeguarding of assets, financial reporting, operations and compliance with regulations. PwC was required to evaluate whether poor controls might lead to or contribute to the risk that fraud might not be detected.

83.     Internal controls are essential to a company's financial reporting, as adequately designed internal controls provide a company with reasonable assurance on the reliability of financial reporting, the effectiveness and efficiency of operations, and compliance with applicable laws and regulations.  AU §319.06.  Under auditing standards, as set forth in AU §319.02:

> In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation.

84.     If an auditor identifies any material weaknesses in a company's internal controls during an audit, then the auditor must communicate these weaknesses to the company's audit committee.  AU §325.  Further, the auditor should identify any limitations related to the internal control weaknesses in his or her audit opinion in accordance with the procedures proscribed by the professional standards.

85.     With respect to Huron's internal controls for 2006-2008, PwC represented, in its Reports of Independent Registered Public Accounting Firm dated February 22, 2007, February 19, 2008 and February 24, 2009, that in its opinion the Company had maintained effective internal controls.

86.     Despite PwC's "clean" audit reports for 2006 through 2008 and its assessment as to the effectiveness of Huron's internal controls, Huron announced a significant restatement related to its acquisition accounting and an SEC inquiry into its revenue recognition.

87.     The reasons for Huron's restatement and the SEC inquiry involve periods during which Huron's financial results had been audited and/or reviewed by PwC and for which PwC had issued unqualified opinions and approved of Huron's publicly announced results.

**PwC's Audit Violated Fundamental Concepts of GAAS**

88.    PwC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of several years, leading to false and misstated financial statements.  Due to PwC's false statements and failure to identify and modify its report to identify Huron's false financial reporting, PwC violated the following GAAS standards:

(a)    The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors;

(b)    The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

(c)    The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report;

(d)    The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised;

(e)    The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

(f)    The third standard of field work is that sufficient, competent evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit;

(g)    The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP;

(h)    The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed;

(i)    The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report; and

(j)    The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

## LOSS CAUSATION/ECONOMIC LOSS

89.    By misrepresenting its testing processes and results, the defendants presented a misleading picture of Huron's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Huron's testing did not have adequate controls over employees involved in testing data, Huron falsely reported positive test results.

90.    These claims of favorable data caused and maintained the artificial inflation in Huron's stock price throughout the Class Period and until the truth was revealed to the market.

91.    On July 31, 2009, defendants were forced to publicly disclose the departure of the Company's entire management team and that the Company would be restating its financial statements from 2006-2008, causing its stock to collapse from $44.35 per share to close at $13.69 per share, a one-day decline of 69%.

92.    As a direct result of defendants' admissions and the public revelations regarding the truth about Huron's overstatement of income and its actual business prospects going forward, Huron's stock price fell more than 84% from its Class Period high, falling from $83.25 per share on December 26, 2007 to as low as $13.69 per share on August 3, 2009.  This drop removed the inflation from Huron's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

93.    Plaintiff incorporates ¶¶1-92 by reference.

94.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

      (a)    employed devices, schemes and artifices to defraud;

      (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Huron common stock during the Class Period.

96.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Huron common stock.  Plaintiff and the Class would not have purchased Huron common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against Huron and the Individual Defendants

97.    Plaintiff incorporates ¶¶1-96 by reference.

98.     The Individual Defendants acted as controlling persons of Huron within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Huron stock, the Individual Defendants had the power and authority to cause Huron to engage in the wrongful conduct complained of herein.  Huron controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 5, 2009                           Plaintiff


By:  */s/  Marvin A. Miller*
Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Darren J. Robbins
David C. Walton
Catherine J. Kowalewski
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Hamilton Lindley
KENDALL LAW GROUP, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

Attorneys for Plaintiff

Plaintiff's Certification of Investment of
Huron Consulting Group, Inc.

I, Dorothy DeAngelis, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the Complaint in this action and authorize the filing of this Certification.

2.      If chosen, I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial (if necessary).  I am willing to participate on an executive committee of shareholders.

3.      Plaintiff's transaction in Huron security that is the subject of this action is:

| # SHARES PURCHASED | DATE PURCHASED | PRICE PER SHARE | CLASS OF STOCK (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SOLD PRICE |
|---|---|---|---|---|---|---|
| All were restricted grants from company as follows: 422 | 7/1/06 | $35.09 | Common | 422 | 8/3/09 | $11.30 |
| 422 | 7/1/07 | $73.01 | Common | 422 | 8/3/09 | $11.30 |
| 506 | 3/1/08 | $53.06 | Common | 506 | 8/3/09 | $11.30 |
| 426 | 7/1/08 | $45.34 | Common | 426 | 8/3/09 | $11.30 |

4.      I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

5.      During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

6.      I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

Signed under penalty of perjury, this ___4th___ day of ____August_____, 2009.

_____          ___104 Village Glen Way_____
Signature                                Address

___Dorothy DeAngelis_____       Mount Holly____NC_____28120___
Name (please print)                      City          State      Zip

___704-827-4465_____         dorothydeangelis@msn.com_____
Telephone Number                          Email Address

Return to:
Kendall Law Group, LLP
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Telephone: 214-744-3000
Facsimile: 214-744-3015